IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRIAN WILSON #324-060                    *
     Plaintiff,

                     *

     v.                                   CIVIL ACTION NO. DKC-11-111

                     *

MARYLAND DIVISION OF
CORRECTION, *et al.*,                    *
     Defendants.

                     *

## MEMORANDUM OPINION

### I. Procedural History

This 42 U.S.C. § 1983 prisoner civil rights action seeks injunctive relief[1] and damages for the alleged denial of proper medical care. Brian Wilson ("Wilson") claims that an MRI, knee brace and other treatment have been withheld over a period of several years, despite his complaints of pain and an x-ray showing a possible chipped bone.[2]

State Defendants Maryland Division of Corrections and Warden John S. Wolf ("Correctional Defendants") and Physicians Assistants John Moss and Marvin H. Bruce[3] ("Medical Defendants") have filed Motions to Dismiss or, in the Alternative, for Summary Judgment. ECF Nos. 9 and 12. Wilson has filed opposition materials. ECF No. 11. A hearing is not needed to resolve the constitutional issues presented in the matter. *See* Local Rule 105.6. (D. Md. 2010). For reasons which follow, Defendants' Motions shall be granted.

---

[1] Wilson requests that he receive an MRI and full access to his medical records. ECF No. 1 at 3.

[2] Wilson states that an "[u]nknown x-ray expert" twice x-rayed his knee, and after the second x-ray found "a questionable image appearing to be a chipped bone." ECF No. 3. Although Wilson named this "Unknown X-Ray Expert" as a party defendant, the individual has not been further identified and the complaint provides no basis for liability given this individual's conduct.

[3] The Clerk shall amend the docket to reflect this Defendant's full name.

## II. Standard of Review

### Motion to Dismiss

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to prove the 'grounds' of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corporation v. Twombley*, 550 U.S. 544, 554, 127 S.Ct. 1955, 1964-65 (2007). "[S]omething beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a 'largely groundless claim' be allowed to 'take up the time of a number of other people...'" *Id*. at 557-558 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). "[T]hreadbare recitals of the elements of a cause of action, supported by mere statements, do not suffice." *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S.Ct. 1937, 1949 (2009). In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). However, "because the court is testing the legal sufficiency of the claims, the court is not bound by plaintiff's legal conclusions." *Takacs v. Fiore*, 473 F.Supp.2d 647, 651 (D. Md. 2007).

### Motion for Summary Judgment

Under the December 10, 2010 revisions to Fed. R. Civ. P. 56(a):

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

> matter of law.   The court should state on the record the reasons for
> granting or denying the motion.

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).   "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

**Eighth Amendment Right to Medical Care**

In alleging a denial of his Eighth Amendment right to necessary medical care, Wilson must prove two essential elements. First, he must satisfy the "objective" component by illustrating a serious medical condition.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998).  If he proves this first element, Wilson must then prove the second "subjective" component of the Eighth Amendment standard by showing deliberate indifference on the part of Defendants.  *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991)

(holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. Medical staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844; *see also Johnson v. Quinones*, 145 F.3d at 167.

### III.    Analysis

<u>Correctional Defendants</u>

Counsel for Defendant Maryland Division of Correction seeks dismissal on the basis of immunity. ECF No. 9 at 2. Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits for damages in federal court brought by its citizens or the citizens of another state, unless it consents. *Penhurst State School and Hospital v. Halderman*, 465 U. S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts, *see* Md. State Gov't Code Ann., § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. For this reason the motion to dismiss made on behalf of the Maryland Division of Correction must be granted as to damages.

Defendant Wolfe argues, in addition, that (1) Wilson failed to complete administrative remedies concerning his knee complaints; (2) Wilson's knee pain does not constitute a serious medical condition; and (3) as Warden, Wolfe had no personal involvement in providing Wilson

with medical care. ECF No. 9 at 3-7. The parties agree that Wilson filed an Administrative Remedy Procedure (ARP) complaint concerning his knee problem, although it does not appear that Wilson appealed the dismissal of the ARP to the Commissioner. ECF No. 9 at 5 and Exhibit A; ECF No. 1. Medical care at the prison is performed by a medical contractor, and the Warden is entitled to rely on the judgment of medical personnel to manage inmate medical treatment. *See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990). The Court declines to dismiss Defendant Wolfe on the basis of non-exhaustion, it appearing that use of the ARP process for medical issues should not be part of the grievance process.[4]

Wilson's claim against Warden Wolfe is based on supervisory liability, or respondeat superior. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior

---

[4] Title 42 U.S.C. § 1997e(a) requires "proper exhaustion," which means "complet[ing] the administrative review process in accordance with the applicable procedural rules." *Jones v. Bock,* 549 199, 127 S.Ct. 910, 922-23 (2007) (quoting *Woodford v. Ngo,* 548 U.S. 81, 88 (2006). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* at 923. Exhaustion of all administrative remedies means that a prisoner must use all steps that the Department of Corrections requires and must follow such steps properly. *See Woodford*, 548 U.S. at 90. The Maryland Division of Correction does provide for a grievance process. As noted by *Chase v. Peay*, 286 F.Supp.2d 523 (D. Md. 2003), a Maryland inmate satisfies exhaustion by seeking review of an ARP complaint denial from the Warden to the Commissioner and then appealing the Commissioner's decision to the Inmate Grievance Office ("IGO"), the *final level* of appeal within Maryland's administrative grievance system for prisoners. *See Chase*, 286 F.Supp.2d at 529.

The issue before the court is whether Maryland inmates must exhaust administrative remedies under the DOC grievance process regarding complaints against private healthcare contractors and their employees. The court finds state court evaluation of the same issue instructive, as it was fully briefed and examined by the Maryland high court. In *Adamson v. Correctional Medical Services, Inc.*, 359 Md. 238 (Md. 2000), the Court of Appeals of Maryland reviewed the legislative history of the Maryland Administrative Remedy Procedure ("ARP") process and noted that it permits a prisoner to submit a complaint for grievances against officials or employees of the Maryland Division of Correction and Patuxent Institution through to the IGO. It further observed that ARP grievances must be exhausted through to the IGO before seeking judicial review. Finally, the Court of Appeals noted that the documentation presented in the case establishes that the IGO declines to hear prisoner grievances against private health care contractors. *Adamson*, 359 Md. 266-271. In sum, the Court of Appeals found that the Maryland prisoner administrative remedy process does not encompass complaints against private medical providers under contract with the state.

The Court finds the Court of Appeals of Maryland's analysis persuasive. After extensive examination of the legislative and practical history of the Maryland ARP process it concluded that the process was directed at claims against DOC and Patuxent employees. It further determined that the IGO does not hear remedy appeals filed against private healthcare contractors. Maryland inmates cannot and should not be required to exhaust the administrative remedy process involving claims filed against healthcare staff because the Maryland DOC has not made the ARP process available to them in such cases.

liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.' " *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001), *citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Here, Defendant Wolfe responded to Wilson's ARP after investigation revealed that Wilson had been seen regularly by medical staff for his knee ailment and that no documentation corroborated Wilson's claim of entitlement to a knee brace. ECF No. 9, Exhibit 1 at 3-6. Nothing more is constitutionally required.

<u>Medical Defendants</u>

At the time of his initial complaint of knee pain and swelling, Wilson was housed at the North Branch Correctional Institution. On January 8 and January 11, 2008, he submitted sick call request forms stating he could barely bend his right knee.[5] On January 16, 2008, he told Dr. Masoud Djabanmir the swelling had improved but the pain persisted. Motrin and muscle rub

---

[5]  Wilson indicated he had injured the knee in December of 2007. ECF No. 12, Exhibit C at 1.

were prescribed, and Wilson was advised to exercise the knee and return for a follow-up evaluation in two weeks. Wilson received an Ace wrap to use for three months. ECF No. 12, Exhibit A, ¶ 3 and Exhibit C at 1-4.

Thereafter, Wilson was transferred to Jessup Correctional Institution (JCI). On April 16, 2008, he submitted a sick call request form complaining that the Ace bandage he had received at NBCI after injuring his right knee did not help. Wilson requested the knee be x-rayed. Defendant Moss, a physician's assistant, evaluated the knee of April 22, 2008, and noted no apparent distress. The knee was not swollen and Wilson did not have joint-line tenderness. The knee was stable but did exhibit crepitus (a crackling or grating noise) when subjected to range-of-motion ("ROM") movement. Moss showed Wilson how to do exercises to strengthen the quadriceps muscles[6] in the thigh to help reduce knee pain. ECF No. 12, Exhibit A, ¶ 4 and Exhibit C at 6.

On July 14, 2008, Wilson submitted a sick call request form complaining he reinjured his knee several days before and requested an x-ray. When Moss evaluated Wilson on July 23, 2008, Wilson stated the injury in fact occurred about six weeks earlier during a basketball session. Moss's examination revealed the right knee was not swollen, exhibited full ROM, was stable, and revealed no neurological deficits. Moss noted Wilson had tenderness of the kneecap tendon and one ligament in the knee, and advised Wilson to decrease his activity, rest the knee, apply warm moist compresses, and return if symptoms persisted. ECF No. 12, Exhibit A, ¶ 5 and Exhibit C at 7-8.

On September 17, 2008, Wilson requested an x-ray of the right knee. He did not appear for his sick call visit. ECF No. 12, Exhibit A, ¶ 6. During his November 18, 2008 annual

---

[6] The quadriceps muscles in the thighs are responsible for movement of the kneecaps and straightening of the knees. *Id*., Exhibit A at 3 n. 2.

physical examination, Wilson did not complain to Moss of knee pain.  *Id*., Exhibit A, ¶ 7 and Exhibit C at 10-11.

On May 29, 2009, Wilson submitted a sick call slip stating he had been asking for an x-ray of his right knee for two years and the knee was still giving him problems.  He did not appear at his scheduled sick call appointment.  ECF No. 12, Exhibit A, ¶ 8 and Exhibit C at 12.

Physician's Assistant Bruce evaluated Wilson on July 1, 2009, for a complaint of knee pain.  Bruce noted the knee muscles were weak and Wilson had a slightly reduced ROM.  Bruce ordered an x-ray and a knee brace.  On November 17, 2009, Wilson submitted a sick call request form indicating the x-ray had not yet been taken.  The x-ray, performed that day, revealed no evidence of a fracture and showed normal knee alignment.  *Id*., Exhibit A, ¶ 9 and Exhibit C at 13-16.

Wilson next complained of knee problems on April 3, 2010.  He was examined that day and told Registered Nurse Frida Mande that he had slipped in the kitchen, injuring the right knee. He indicated the pain was minor when he walked and he could handle the pain.  Mande advised Wilson to rest and apply ice or cool compresses to the knee, and provided an Ace wrap for support.  An x-ray taken that day showed small bony densities in the right knee joint space that might represent a forcible tearing, and small joint swelling.  Paper No. 12, Exhibit A, ¶ 10 and Exhibit C at 17-19.

On November 21, 2010, Wilson submitted a sick call request form inquiring about the results of the x-ray and stating the knee still gave him problems.  Moss evaluated Wilson on November 29, 2010, and found a stable knee joint with full ROM, no swelling, and no neurovascular deficits.  Moss discussed the results with Wilson, advised him to apply warm

compresses to the knee, and prescribed Tylenol for pain. ECF No. 12, Exhibit A, ¶ 11 and Exhibit C at 20-23.

On January 6, 2011, Wilson submitted a sick call request form complaining of sharp pain in the right knee starting that morning. Moss examined Wilson and noted tenderness and mild pain with motion. Moss discontinued Tylenol and prescribed indomethacin, a non-steroidal anti-inflammatory medication ("NSAID"). Wilson was advised again to apply warm compresses to the knee, avoid heavy lifting, and return to the dispensary if the condition worsened or did not improve within fifteen days. ECF No. 12, Exhibit A, ¶ 12¶, Exhibit C at 24-26.

Wilson apparently suffers periodic episodes of knee pain that are exacerbated by physical activity or simply by slipping on the floor. It appears some degenerative changes have occurred in his right knee. As noted in Wilson's opposition (ECF No. 11 at 1), the medical defendants have not provided a previously-prescribed knee brace. Otherwise, Wilson has failed to come forward with opposition materials refuting Defendants' affirmations. His dissatisfaction with the conservative treatment provided to date amounts to nothing more than a disagreement between medical staff and an inmate as to a course of treatment, and does not rise to a constitutional injury.[7] *See Davis v. Greene*, 2009 WL 3064106, at *13 (S.D. W.Va., 2009). Delays in providing the x-ray do not appear to have caused Wilson harm. Given the objective findings regarding Wilson's injury and the conservative and measured response by medical personnel to his subjective complaints of pain, Wilson has failed to show a genuine issue of material fact as to his entitlement to money damages or injunctive relief mandating he be provided an MRI.[8]

---

[7] Whether Wilson will require more extensive treatment for his knee in the future is unknown at this time.

[8] The State Defendants did not address Wilson's claim of entitlement to his medical records. The Department of Public Safety and Correctional Services ("DPSCS") provides a mechanism for prisoners to review and receive

IV.     Conclusion

For the aforementioned reasons, Defendants' Motions to Dismiss or for Summary Judgment will be granted. Defendant Maryland Division of Correction shall be dismissed and judgment entered in favor of of the remaining Defendants and against Wilson.  A separate order follows.


Date:   May 25, 2011                                    /s/
                                          DEBORAH K. CHASANOW
                                          United States District Judge

---

copies of their medical records.  ECF No. 12, Exhibit D. Although Wilson states he has requested his records, he is advised to formally request review of his records in accordance with DPSCS policy.